UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LEONARD J. AGNELLO, III,

       Plaintiff,

v.                                        Case No. 3:15cv516-CJK

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

       Defendant.
_____/

## MEMORANDUM ORDER

This case is before the court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of Social Security ("Commissioner") denying Leonard Agnello's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34.  The parties consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73 for all proceedings in this case, including entry of final judgment.  Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner, therefore, will be affirmed and the application for DIB will be denied.

## ISSUE ON REVIEW

Mr. Agnello, who will be referred to as claimant, plaintiff, or by name, raises one issue.  He claims the Administrative Law Judge ("ALJ") erred by discounting the opinion of treating physician Charles R. Thompson, M.D.[1]  (Doc. 9).

## PROCEDURAL HISTORY

On October 18, 2011, plaintiff protectively filed an application for DIB, claiming disability beginning May 15, 2011.  T. 87.[2]  The Commissioner denied the application initially and on reconsideration.  T. 86, 98.  Claimant appeared before the ALJ for hearings on August 14, 2013, and March 3, 2014.  T. 20, 44.  After the second hearing, the ALJ found claimant was not disabled under the Act.  T. 71-81.  The Appeals Council denied a request for further review and, as a result, the ALJ's decision became the final determination of the Commissioner.  T. 1-3.  The determination of the Commissioner is now before the court for review.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

_____

[1] Plaintiff also claims the ALJ erred by relying on the vocational experts' responses to hypothetical questions that did not include the limitations found in Dr. Thompson's opinion.  (Doc. 9, p. 20-21).  Because finding the ALJ erred in this respect is dependent on finding error in the rejection of Dr. Thompson's opinion, it need not be addressed separately.

[2] The administrative record filed by the Commissioner consists of 7 volumes (docs. 7-2 through 7-8) and has 517 consecutively numbered pages.  References to the record will be by "T.," for transcript, followed by the page number.

•       Claimant has not engaged in substantial gainful activity since May 15, 2011, the alleged onset date.  T. 73.

•       Claimant has the following severe impairments: orthostatic hypotension, dysautonomia, sinus bradycardia with sinus arrhythmia, and obesity. T. 73.

•       Claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except as follows.  He can lift and/or carry 10 pounds occasionally and items of negligible weight frequently.  He can stand and/or walk for 2 hours of an 8-hour workday, no more than 20 minutes at a time, and sit for 6 hours of an 8-hour workday, no more than 45 minutes at a time. He can perform occasional pushing and/or pulling with the upper and lower extremities, bilaterally.   He can perform no balancing, occasional stooping, occasional kneeling, occasional crouching, occasional crawling, and occasional climbing of ramps and stairs.  He can perform no climbing of ladders, ropes, or scaffolds.   He can perform occasional overhead reaching, bilaterally; frequent reaching in other directions, bilaterally; frequent handling, bilaterally; continuous fingering, bilaterally; and continuous feeling, bilaterally.  He can tolerate occasional exposure to extreme heat and occasional exposure to vibration.  He must avoid all exposure to unprotected heights and dangerous machinery.   He can perform occasional operation of motor vehicles.  He would have one unplanned absence per

month.   He can sustain concentration and attention for 2-hour periods with customary breaks.  T. 75.

•      Claimant is unable to perform any past relevant work.  T. 79.

•      Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform.  T. 80.

•      Claimant has not been under a disability, as defined in the Act, from May 15, 2011, through May 21, 2014.  T. 81.

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards."  *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'"  *Dyer v. Barnhart*, 395 F.3d 1206, 1210

(11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986)

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). The reviewing court, however, may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985).

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)(4), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from performing his past relevant work, he is not disabled.[3]

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, he is not disabled.

<u>FACT BACKGROUND AND MEDICAL HISTORY</u>[4]

At the August 14, 2013, hearing before the ALJ, Mr. Agnello offered testimony as to his health, daily activities, and work history.  He was born in 1983 and worked primarily as a firefighter and emergency medical technician ("EMT") after graduating high school.  T. 47-49.  On a typical day, "not a whole lot happens" between the time claimant wakes up and noon.  T. 51.  When he wakes up, "it's very much like [he] didn't sleep at all that night."  T. 55.  Depending on how he feels, he "may go back to sleep" or "attempt to catch up on some house chores."  T. 51.  "[I]f it feels like a normal good day," he will "run . . . errands out in town" during the afternoon.  T. 51.  He ordinarily tries to return home before 2:00 to 2:30 p.m.,

---

[3] "[C]laimant bears the initial burden of establishing a severe impairment that keeps him from performing his past work."  *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

[4] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record.  The facts below, where not derived from the medical records, are based largely, if not entirely, on plaintiff's testimony in that regard.  Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

however, "because [he is] going to need [to] nap . . . for a couple hours before [he] can . . . do anything that evening."  T. 51.

Mr. Agnello usually feels the need to sit after 15 to 20 minutes of continuous standing.  T. 52.  He can walk at a slow, casual pace for 15 to 20 minutes before needing to stop.  T. 52.  He can sit for 20 to 30 minutes before he has to get up and move around.  T. 52.  Each day, plaintiff experiences "neuro-syncope" episodes; the episodes may be triggered by a variety of events, including moving from a sitting to standing position, increased mental and physical stress, and performing chores around the house.  T. 53.  Plaintiff testified, however, that "[i]t's been a while since" his last "full-on fainting[.]"  T. 53.  Claimant also experiences an "extreme amount of fatigue" and "chronic nausea [up] to 10-15 times a day."  T. 55-57.  He takes several helpful medications, but is never "totally relieved of the symptoms associated with [his] dysautonomia."  T. 58-59.  Because the severity of his symptoms vary from day-to-day, he does not believe he can be a reliable employee. T. 54.

At the supplemental hearing held on March 3, 2014, Agnello testified he had been attending Pensacola State College for the past 3 semesters and was currently taking 3 classes (12 credit hours).  T. 29.  The 75-minute-long classes each met 2 times a week.  T. 29-30.  On average, claimant missed 1 class a week, but his professors were "able to work with [him]."  T. 30.

On April 19, 2011, plaintiff visited Dr. Steven Lenga and reported: (1) sleeping more than usual for the previous two weeks; and (2) "if he gets up suddenly he becomes lightheaded and has . . . tunnel vision like he [is] about to pass out." T. 359. While working as a firefighter, he "got up from a lying position and experienced new symptoms. The next thing he remembered he was laying on the floor between two bunks." T. 359. Dr. Lenga assessed "syncopal event/orthostasis likely associated with [claimant's] significant weight loss over the past 3 months." T. 360. To rule out the presence of significant structural heart disease, Dr. Lenga ordered an electrocardiogram and echocardiogram; he also gave plaintiff a work excuse until the test results arrived. T. 360.

The test results were within normal limits with findings of mild sinus bradycardia and mild tricuspid regurgitation. T. 357-58. On April 27, however, plaintiff stated he felt "like he is in a boat on water all the time, feeling very shakey and dizzy." T. 357. He also indicated he experienced dizziness and shortness of breath after climbing 3 flights of stairs. T. 357. Dr. Lenga ordered a tilt table test and referred plaintiff to a neurologist. T. 357.

The neurologist, Dr. Jorge Pelaez, evaluated Agnello on May 3, 2011. T. 354-56. Claimant reported he had episodes of dizziness after standing, characterized by light-headedness, warmth, and shrinking vision; he "blacked out" one time at work, and does not know how long he was unconscious. T. 354. Although Dr. Pelaez did

not have access to the full report, he noted the tilt table test "was apparently abnormal." T. 354. Pelaez initially diagnosed positional episodes of dizziness with presyncopal or syncopal episodes appearing likely, but he "doubt[ed] a primary [central nervous system] etiology." T. 355. He ordered an electroencephalogram ("EEG") and recommended that plaintiff follow seizure precautions at all times, avoid driving, and stop working until the cause of the symptoms could be clarified. T. 355.

The EEG was "unremarkable" and "within normal limits." T. 349, 375. However, the April 28 tilt table test showed orthostasis when claimant moved from a supine to standing position. T. 351. Agnello "also demonstrated significant reflexive tachycardia with a component of . . . positional orthostatic tachycardia[.]" T. 351. Dr. Lenga prescribed Florinef and restricted plaintiff to administrative duties until seeing his response to the medication. T. 351, 434. On May 24, 2011, Dr. Lenga cleared claimant to resume working as an EMT after noting his orthostasis was "much improved on the Florinef" and he was not having syncope. T. 345-46. In a June 28 follow-up, Lenga again noted "definite improvement on the Florinef" and "no overt syncope." T. 342. Plaintiff, however, reported the seasonal temperature increase caused some lightheadedness. T. 342. Dr. Lenga referred plaintiff to Dr. Charles Thompson for further treatment. T. 344.

From July 18, 2011, to January 23, 2014, Dr. Charles Thompson treated Mr. Agnello.  T. 472.  During this time, claimant repeatedly complained of dizziness, lightheadedness, fatigue, near-syncope, nausea, tunnel vision, proximal muscle weakness in his legs, and chest pains.  T. 461, 464, 467, 469, 472, 475-76.  On March 6, 2012, plaintiff reported he was "still having a lot of problems" and "had to help somebody move and had near-syncope with very little exertion."  T. 464.  He reported taking 2 to 3 hour naps in the afternoon due to fatigue and indicated he continued to experience dizziness, lightheadedness, exercise intolerance, nausea, and vomiting.  T. 464.  On October 15, 2012, he reported having a syncopal episode in the previous 2 to 3 weeks.  T. 492.

Dr. Thompson completed a preprinted Medical Source Statement on May 24, 2013, indicating claimant suffered from dysautonomia, syncope, restless leg syndrome, fibromyalgia, migraines with aura, and chronic fatigue syndrome.  T. 489-91.  Dr. Thompson concluded claimant: (1) can walk 1 block without rest or severe pain; (2) can sit for 20 minutes at a time before needing to get up; (3) can stand for 10 minutes at a time before needing to sit down or walk around;[5] (4) can sit and stand/walk for less than 2 hours in an 8-hour workday (with normal breaks); (5) would to need to take unscheduled breaks during the workday; (6) can

_____

[5] For the questions concerning claimant's ability to sit or stand at one time, Dr. Thompson noted "varies (unable to predict)."  T. 490.

occasionally lift and carry 10 pounds or less; (7) can never lift or carry 20 pounds or more; (8) can never twist, stoop (bend), or crouch/squat; and (9) can tolerate moderate work stress.  T. 490-91.  Dr. Thompson also indicated plaintiff would likely be absent from work more than 4 days per month as a result of his impairments and treatment.  T. 491.

On August 5, 2013, claimant told Dr. Thompson he drove to Maryland, though he had a "tough time."  T. 513.  He reported performing household chores was "really difficult."  T. 513.  In January 2014 he was doing "fairly well."  T. 510.  He was "taking 3 classes and ha[d] missed a few but not many"; he reported having to review his lessons several times to retain the information.  T. 510.

In January 2012 claimant resumed seeing Susan Lightfoot, a licensed mental health counselor who treated plaintiff for "depressive symptoms" and "mood instability" in 2007 and 2008.  T. 440.  Claimant reported fatigue, nausea, vomiting, and weight loss, as well as frustration with his inability to engage in activities he enjoyed.  T. 440.  He stated he lost his job as a firefighter and paramedic due to frequent absenteeism.  T. 440-41.  Lightfoot believed Mr. Agnello suffered from a mood disorder and an anxiety disorder caused by dysautonomia.  T. 441.

In October and November of 2012, Ms. Lightfoot noted plaintiff appeared stable and relatively cheerful.  T. 480-82.  Likewise, on December 27, 2012, she noted: "Appears to be feeling relatively stable, although the change in weather did

affect him for several days last week with nausea and vomiting, fatigue and pain." T. 479.  Claimant stated he was "looking forward to starting classes next month."  T. 479.  On January 24, 2013, plaintiff "arrived late after sleeping late and was apologetic."  T. 478.  Lightfoot noted Agnello's "general health is relatively stable at this time."  T. 478.  Claimant decided to drop his online English composition class because "it would be too hard to do well[.]"  T. 478.  However, he was also taking a math class in a conventional classroom and indicated he was "doing well."  T. 478. Claimant said he "noticed his general health seems better since starting school."  T. 478.

<u>ANALYSIS</u>

Mr. Agnello argues the ALJ erred by discounting the opinion of treating physician Dr. Thompson.  Absent good cause, the opinion of a treating physician must be accorded considerable or substantial weight by the Commissioner.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004).  "Good cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips,* 357 F.3d at 1241.

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ must give it controlling weight.  *See* 20 C.F.R. § 404.1527(c)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) the consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c)(2).  "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 357 F.3d at 1241.  "[F]ailure to do so is reversible error." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).

The ALJ concluded the Medical Source Statement completed by Dr. Thompson on May 24, 2013, "merit[ed] no substantial weight" because it was "not consistent with the treatment or activities of daily living evidence." T. 79.  The ALJ noted: (1) Dr. Thompson's June 20, 2013 treatment notes "indicated the claimant

reported that taking low doses of Adderall seemed to help his fatigue"; and (2) "the claimant indicated to Ms. Lightfoot in January 2013, that he had noticed that his general health seemed better since starting school; and she noted that the claimant was essentially doing well, regarding his health."  T. 79.

Plaintiff counters the ALJ, arguing that Dr. Thompson's opinion is supported by the doctor's treatment records and "other treatment records," including: (1) "a markedly positive tilt table test showing orthostatic hypotension and postural orthostatic tachychardia syndrome (POTS)"; (2) Dr. Lenga's records; (3) counselor Lightfoot's records; and (4) a Federal Employees Retirement System ("FERS") disability determination.  (Doc. 9, p. 15-20).

An independent review of the record shows substantial evidence supports the ALJ's decision to discount Dr. Thompson's opinion.  Although plaintiff characterizes Thompson's treatment notes as supporting his opinion, the notes primarily memorialize plaintiff's subjective statements concerning his condition. The ALJ, however, found "claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible" and claimant does not challenge that finding in this appeal.  T. 76; T. 78 ("As for the subjective factors, the claimant's allegation of disabling dysautonomia is not fully credible."); *see United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) ("[A] party seeking to raise a claim or issue on appeal must plainly and prominently

so indicate.  Otherwise, the issue—even if properly preserved at trial—will be considered abandoned.").  The transcription of plaintiff's statements into Dr. Thompson's notes does not make the statements more credible.

Similarly, the "other treatment records" plaintiff cites to bolster Dr. Thompson's opinion do not support reversing the ALJ's decision.  *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986) ("Even if the evidence preponderates against the [Commissioner], we must affirm if the decision is supported by substantial evidence.").  Although the tilt table test results and Dr. Lenga's records support the diagnoses of orthostatic hypotension and POTS, a mere diagnosis does not establish the severity of a condition.  *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) ("[T]he mere existence of these impairments does not reveal the extent to which they limit [the] ability to work or undermine the ALJ's determination in that regard.").  Moreover, claimant began taking medication after the test, which, as described below, improved claimant's condition.  In fact, Dr. Lenga indicated plaintiff could resume work as an EMT after noting he was "much improved on the Florinef."  T. 346.

Contrary to plaintiff's claim, counselor Lightfoot's records also support the ALJ's decision to discount Dr. Thompson's opinion.  Lightfoot frequently recorded that Mr. Agnello was doing well and appeared stable.  T. 478-82, 484-85.  Although plaintiff told Dr. Thompson on October 15, 2012, that he experienced a syncopal

episode "about 2 to 3 weeks ago" where he "fell through [a] chain link gate and broke it[,]" T. 492, visits to Lightfoot on October 2 and October 30 reveal no mention of the syncopal episode.  T. 481-82.  On October 2 claimant reported "he has been 'not too bad' since [his] last visit" on September 4; on October 30 Lightfoot noted claimant was "doing well overall" and "his health has remained relatively stable and he is actively out socially[.]"  T. 481-83.  Similarly, in December 2012 he stated he was "looking forward to starting classes next month" and was "more stable with his health issues," which "bolster[ed] his confidence on starting a new career at some point in the future."  T. 479.  On January 24, 2013, Lightfoot noted claimant's "general health is relatively stable at this time" and claimant "noticed his general health seems better since starting school."  T. 478.

Further, and as the ALJ noted, Mr. Agnello's activities of daily living were inconsistent with the limitations set forth in Dr. Thompson's opinion.  *See Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (ALJ may consider a claimant's daily activities when evaluating his subjective complaints and RFC).  Claimant was able to drive from Florida to Maryland.  T. 513.  Although he stated he had a "tough time" and "had to pull over several times due to fatigue," T. 513, the ability to undertake such a long trip is inconsistent with Dr. Thompson's opinion—particularly the portion indicating claimant can sit for less than 2 hours in an 8-hour workday.  T. 490.  Likewise, on October 2, 2012, plaintiff told counselor Lightfoot he spent 10

hours at a concert festival on the beach, T. 482, which is inconsistent with the sitting, standing, and walking limitations set forth by Dr. Thompson.

The record contains numerous references to other activities which lend further support to the ALJ's decision.  On July 3, 2012, plaintiff reported travelling "to New Orleans to see a concert and spend a few days with a good friend and his parents." T. 485.  The next month he stated he goes out for beers with former coworkers and plays percussion for a friend composing music.  T. 484.  He also indicated he can "complete all personal grooming" without assistance, prepare food in the microwave, shop, drive himself to appointments, and complete household chores. T. 259, 269.  At the March 3, 2014, hearing, claimant testified that he had completed 2 semesters of college and was taking 12 credit hours during the spring 2014 semester.  T. 29.  During plaintiff's most recent visit to Dr. Thompson on January 23, 2014, he confirmed he was taking 3 classes and "doing fairly well"; he "missed a few but not many."  T. 510.

In addition, the record shows claimant's condition improved with medication. *See* 20 C.F.R. § 404.1529 (noting an ALJ will consider "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken" when evaluating the limiting effects of symptoms).  After plaintiff began taking Florinef in May 2011, Dr. Lenga noted he was "clinically much improved" and could return to work as an EMT.  T. 393, 399.  In a January 4, 2012 telephone call with the

government, Agnello reported suffering from insomnia and exercise intolerance, but indicated "he has had minimal episodes of lightheade[d]ness or dizziness since starting on the medications," stating he experienced only "1 episode in the last 30 days."  T. 259.  Likewise, on April 19, 2012, claimant reported only 1 episode of dizziness in the previous 30 days.  T. 269.  In March 2012 claimant reported that moving in with his mother made him "more diligent about taking his medications routinely," which "helped his overall physical symptoms."  T. 488.  On July 3, 2012, claimant told counselor Lightfoot that "the beta blocker he has been taking seems to be helping with his symptoms much more than he expected."  T. 485.

Lastly, Mr. Agnello asserts the FERS determination that he is disabled supports Dr. Thompson's opinion.  (Doc. 9, p. 17).  Although another agency's disability determination is not binding on the Commissioner, 20 C.F.R. § 404.1504, it is entitled to great weight if both agencies' definitions of disability are similar.  *See Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984) (holding ALJ erred in not giving great weight to Florida Division of Worker's Compensation finding of temporary total disability because Florida Supreme Court interpreted the Florida statute in such a way that the statute operated similarly to federal social security law).  Claimant noted as to the FERS letter:

> In *Freese v. Astrue*, Case No. 8:06-CV-1839-T-EAJ, 2008 WL 1777722 (M.D. Fla. Apr.18, 2008), the court held that the ALJ failed to address the evidence in the record of claimant's Federal Employee Retirement System disability determination.  Although the FERS

definition of disability may be based on different laws and regulations than the Social Security Administration's, the ALJ must still give great weight to the other agency's finding if the two definitions are construed in a like manner. *Id.* Here, it appears the ALJ did not even consider Plaintiff's favorable federal ruling. Therefore, the ALJ's decision is not supported by substantial evidence.

(Doc. 9, p. 17-18 n.1).

Plaintiff raised this issue in a footnote within the argument concerning the evaluation of Dr. Thompson's opinion. Thus, plaintiff is not independently arguing that the ALJ's failure to address the FERS determination is an error of law requiring remand; instead, plaintiff claims the determination supports Dr. Thompson's opinion and demonstrates the ALJ's decision to reject the opinion is not supported by substantial evidence. (Doc. 9, p. 17-18); *see Anglin v. Soc. Sec. Admin.*, 602 F. App'x 483, 484 (11th Cir. 2015) ("To avoid abandonment, a party must plainly and prominently raise a claim or issue.") (*citing Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014)); *see also Jernigan*, 341 F.3d at 1283 n.8 (holding argument concerning admission of evidence under Fed. R. Evid. 404(b) was waived on appeal because appellant did not "devote[] a discrete section of his argument to claims regarding the evidence of his prior bad acts; instead, each mention of this evidence is undertaken as background to the claims he does expressly advance or is buried within those claims"). Moreover, despite clear instruction in the court's

briefing order,[6] claimant did not elaborate on the import of the FERS determination or explain how the ALJ's failure to address it prejudiced him.

Regardless, the FERS determination letter does not undermine the ALJ's decision. First, the letter simply informs claimant that his application for disability retirement was approved; it does not identify the medical condition that rendered him disabled or explain the rationale for the determination. T. 278-81. *See Davis-Grimplin v. Comm'r, Soc. Sec. Admin.*, 556 F. App'x 858, 863 (11th Cir. 2014) ("[T]he ALJ was plainly justified in giving little weight to the State of Florida's disability determination because all that Davis introduced was a one-page, conclusory document acknowledging that she was receiving worker's compensation benefits.").

Second, the FERS standard for disability differs from the Commissioner's standard. "An applicant for FERS disability retirement must establish by a preponderance of the evidence that: (1) the applicant completed at least 18 months of creditable civilian service; (2) while employed in a FERS position, the applicant became disabled because of a medical condition, resulting in deficient performance,

---

[6] "The memorandum shall specifically identify each issue advanced. The memorandum shall set out the factual and medical matters relevant to the issues argued and shall specifically cite the record, as filed by the Commissioner, by page number for factual contentions. The memorandum shall set ou[t] clearly and concisely plaintiff's legal contentions with appropriate citation of authority for each contention advanced. The Court will consider only those errors specifically identified in the briefs. A general allegation that the ALJ's findings are unsupported by substantial evidence is insufficient. As to each issue, plaintiff shall explain how the error attributed to defendant has prejudiced him." (Doc. 8, p. 2).

conduct, or attendance, or if there is no such deficiency, the condition is incompatible with either useful and efficient service or retention in the position; (3) the disabling medical condition is expected to continue for at least one year from the date of the application for disability retirement; (4) accommodation of the disabling medical condition in the position held is unreasonable; and (5) the applicant has not declined an offer of reassignment to a vacant position." *Kluge v. Office of Pers. Mgmt.*, 293 F. App'x 777, 779 (Fed. Cir. 2008) (citations omitted).  FERS disability applicants, therefore, may be found disabled if they cannot perform their current job with reasonable accommodation and if they have not declined an offer of reassignment to a vacant position within their employing agency.

In contrast, disability under Social Security law is defined as the "inability to engage in *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A) (emphasis added).  Thus, meeting Social Security's definition of "disabled" is significantly more difficult than meeting the FERS definition. *See Trevan v. Office of Pers. Mgmt.*, 69 F.3d 520, 524 (Fed. Cir. 1995) ("the definition of disability under the Social Security Act—inability to perform *any* substantial gainful activity—is stricter than, and logically encompasses, the FERS

disability definition—inability to perform useful and efficient service in the employee's present position or a reasonable reassignment") (citations omitted).

In light of the differences between the definition of "disabled" used by FERS and the Commissioner, a determination by FERS that claimant was disabled was not particularly probative of disability for purposes of social security benefits. *See U.S. ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 316 n.22 (1st Cir. 2010) ("An individual can receive FERS benefits without meeting a definition of disability as stringent as SSDI's 'any occupation' standard, so it cannot be presumed that an applicant meeting FERS's eligibility requirements will also be eligible for SSDI.") (citations omitted).  Therefore, the ALJ's failure to discuss the FERS determination constitutes, at most, harmless error.  *See Hacia v. Comm'r of Social Sec.*, 601 F. App'x 783, 786 (11th Cir. 2015) ("Nor, if the other agency's standard for determining disability deviates substantially from the Commissioner's standard, is it error for the ALJ to give the agency's finding less than substantial weight.").

Accordingly, it is ORDERED:

1.    The decision of the Commissioner is AFFIRMED and plaintiff's application for Disability Insurance Benefits is DENIED.

2.    The clerk is directed to close the file.

DONE AND ORDERED this 7th day of February, 2017.

_/s/_ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**